IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 12-00062-01-CR-W-BCW |
| FRANK G. HAWKINS, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Hawkins' Motion [to] Suppress Evidence of Tape Recorded Conversations (doc #42) and Defendant's Motion for Rehearing (doc #67). For the reasons set forth below, it is recommended that the motion to suppress be granted and the motion for rehearing be denied.

I. INTRODUCTION

On February 22, 2012, the Grand Jury returned a three-count indictment against defendants Frank G. Hawkins and Nathan J. Koop.[1] Count One of the indictment charges that on September 9, 2010, defendants Hawkins and Koop knowingly possessed a Remington, Model 788, .243 caliber bolt action rifle, a Remington, Model 572 Fieldmaster, .22 caliber rifle and a Arizmendi, .38 long caliber revolver, which had been shipped and transported in interstate commerce, knowing and having reasonable cause to believe the firearms were stolen. Count Two charges that on September 9, 2010, defendant Hawkins was a convicted felon in possession of the firearms listed in Count One. Count Three charges that on September 9, 2010, defendant Koop was an unlawful user of a controlled substance in possession of the firearms listed in Count One.

On August 21, 2012, an evidentiary hearing was held on defendant Hawkins' motion to suppress. Defendant Hawkins was represented by appointed counsel William C. Kenney. The Government was represented by Assistant United States Attorney Jalilah Otto. The Government

---

[1]Defendant Koop entered a guilty plea on September 6, 2012.

called Sergeant Michael Ward and Officer Luke Little of the Kansas City, Missouri Police Department, ATF Task Force Officer Jason Decker and defendant Nathan Koop as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On September 9, 2010, Sergeant Michael Ward was a patrol officer assigned to the Crime-Free Multi-Housing Program located at Shoal Creek Patrol Division. (Tr. at 17-18) Officer Ward was working with a partner, Officer Taff. (Tr. at 28) As Crime-Free officers, Officers Ward and Taff were attempting to locate people in the area who had active warrants. (Tr. at 18) Defendant Hawkins had an active warrant. (Tr. at 19) As part of their investigation to locate Hawkins, the officers obtained some addresses with which Hawkins was known to associate. (Tr. at 19) The officers then started going door to door, from address to address, looking for Hawkins. (Tr. at 19) At one of the addresses, a residence at 26th and Bellefontaine, there was a motorcycle up on the front porch which struck the officers as odd. (Tr. at 19-20) The motorcycle was stolen. (Tr. at 20) One of the residents at 26th and Bellefontaine told the officers that the motorcycle belonged to J. (Tr. at 20) According to the database in the police computer system, as well as the residents at 26th and Bellefontaine, J was a nickname for Hawkins. (Tr. at 20)

2. The officers learned from a confidential source that defendant Hawkins was staying with the Koops in a motel off 87th Street in Kansas City, Missouri, in Room 128. (Tr. at 21) The confidential source stated that the last time he/she had seen Hawkins, he had a weapon on him. (Tr. at 21) Given that the officers now had the name Koop, they ran the name Koop in the computer system to check on criminal history, whether there were any active warrants and to get a picture so the officers would know what Koop looked like. (Tr. at 22) Officer Ward learned that Koop had warrants. (Tr. at 22)

3. Officers Ward and Taff went to the motel. (Tr. at 22) Two other officers, Luke Little and Mike Jones, who were conducting surveillance at the motel for defendant Hawkins, met them at the motel. (Tr. at 22-23, 79-80) The officers, who were in uniform, knocked on the door to Room 128. (Tr. at 23, 80) Room 128 had an outside entrance and faced the parking lot. (Tr. at 24) It took 30 to 45 seconds for the knock to be answered. (Tr. at 24) When the door was opened, the officers immediately recognized defendant Koop, called him outside and placed him in handcuffs. (Tr. at 25, 80-81) Officer Ward testified that Koop appeared relaxed and calm. (Tr. at 25) A female and several children were also escorted out of the room. (Tr. at 26, 81) The female was told to stand over on the side away from Koop. (Tr. at 26) The children played on the sidewalk. (Tr. at 26)

4. The officers went into the motel room looking for defendant Hawkins. (Tr. at 26, 81) They checked under the beds to see if he was hiding there. (Tr. at 27-28) The officers located two long guns while looking under a bed. (Tr. at 28, 81) The officers continued to search for Hawkins. (Tr. at 28) Hawkins was not located in the

2

motel room. (Tr. at 28, 81)

5. Once the room was cleared, Officer Ward went outside and talked to the female. (Tr. at 28) Officers Taff and Little talked to defendant Koop. (Tr. at 28, 82) Officer Ward testified that as everything progressed, Koop's demeanor was very, very cooperative, so much so that it struck Ward as odd that Koop was so eager and willing to help the officers get defendant Hawkins. (Tr. at 29) Officer Little testified that Koop was a little frightened at first, but fairly cooperative most of the time. (Tr. at 82) Officers Ward and Little each testified that they never threatened Koop nor did they make Koop any promises or inducements. (Tr. at 30, 82-83) Officers Ward and Little further testified that they did not hear any other officer threaten Koop or make him promises. (Tr. at 38, 82-83) The dash cam audio provides the following with respect to Koop's initial denial of any connection to Hawkins and the threats, promises and/or inducements that were subsequently made to Koop (all taking place while Koop is handcuffed):

> Koop: (with respect to his outstanding warrants) "I'm trying to get a lawyer, I got a lawyer and everything ...." (Government's Ex. 1 at 16:18)
> Taff: "Here's the deal, I don't want you. ... J.R., you were with him yesterday." (Government's Ex. 1 at 16:20)
>
> Koop: "I don't know who he is. I don't know what's going on." (Government's Ex. 1 at 16:30)
> Taff: ... "You're going to jail, I was going to willingly let you go. ... Last chance, if I find out you're lying to me now you're going to jail, or you can take a chance of not going to jail today and get J.R., it's up to you." (Government's Ex. 1 at 16:36 and 17:00)
>
> Koop: "He called me. He wants me to pick him up. ..." (Government's Ex. 1 at 17:12)
> Taff: "We're going to work with that then." (Government's Ex. 1 at 17:18)
>
> Koop: "She [Koop's wife] got me a lawyer ... to get my warrants taken care of." (Government's Ex. 1 at 17:44)
> Taff: "Your kids don't need to see this .... Where's your phone at?" (Government's Ex. 1 at 18:00)
>
> Taff: (after guns are discovered to Koop's wife) "I don't want to take your husband to jail. ... He [Hawkins] just called, so we need his [Koop's] phone, so he's going to call him up and see if we can work something out. I might feel good and not take him to jail today. I might not either ... he wants his phone regardless, so where's it at?" (Government's Ex. 1 at 19:30 and 20:50)
>
> Taff: (after Koop's wife retrieves Koop's phone to Koop) "He [Hawkins] called you on this phone right? So I can go through it and see what he said and all that, that cool?" (Government's Ex. 1 at 22:22)
>
> Taff: I don't want to take you to jail, we've got a big problem though, you're a felon and you've got guns. That's five years, automatic federal time." (Government's Ex. 1 at 23:23)

3

Taff: (with respect to Koop calling Hawkins) "This might save you from going to jail, it might not, it depends on how cool you are. We're going to put it on speaker, and you're going to say 'hey where you at, I'm going to come get you,' or 'do you still need a ride,' or however you usually talk to him [Hawkins]. Then you're going to go get him, but you're not taking this, you're going to get him and pick him up. Then we're going to pull the car over. Then you don't look like the bad guy. Then we take him [Hawkins] to jail, and you go on your way, is that fair enough?" (Government's Ex. 1 at 24:40)

Taff: "We can make this real easy, I'll just call Robbery right now and we'll just file an FIP on you and you can go to jail for five years ... Look guy, if you want to see them [Koop's children] for Christmas, start flapping your gums."[2] (Government's Ex. 1 at 27:00)

Taff: (talking to ATF Task Force Officer Decker on phone and after determining that Koop was not a felon) "Well, apparently he said he got an SIS on it just now, so we got nothing on this guy. ... No, I'm over here. I'm quite a ways away from him." (Government's Ex. 1 at 38:15)

6. Defendant Koop testified at the hearing pursuant to a Kastigar agreement with the government. (Tr. at 40-42; Government's Ex. 3) Koop testified that he is cooperating with the government "in hopes of getting a better sentence." (Tr. at 42) Koop stated that he lived at the motel with his wife and three children. (Tr. at 44) Defendant Hawkins, his girlfriend and two children lived down the hallway at the motel. (Tr. at 44) Koop and Hawkins had gotten to know each other while living at the motel. (Tr. at 45) Koop began driving Hawkins wherever he needed to go. (Tr. at 46)

7. Defendant Koop testified that on September 3, 2010, he went with defendant Hawkins and another person named Nathan to Harrisonville, Missouri to commit a burglary. (Tr. at 46) Koop followed Hawkins into a house and Nathan waited with the truck. (Tr. at 47-48, 59) TVs, a couple safes and a gun case were taken from the house and loaded into the truck. (Tr. at 48) Koop testified that he believed that Hawkins carried the gun case out to the truck. (Tr. at 60) Hawkins, Koop and Nathan then went back to the motel. (Tr. at 49) Originally, everything was taken into Hawkins' room at the motel. (Tr. at 50) Koop was with Hawkins when Hawkins opened the gun case and found two rifles and two revolvers inside. (Tr. at 50-51, 62) Hawkins then asked Koop to hold the guns in his room because Hawkins did not want his son to get a hold of them. (Tr. at 50-51) Hawkins and Koop carried the guns down to Koop's room. (Tr. at 51) They hid the rifles underneath Koop's bed and the revolvers underneath the bathroom sink so that Koop's children would not get to them. (Tr. at 50-51) Koop threw away the gun case. (Tr. at 51)

8. Defendant Koop testified that defendant Hawkins was looking for somebody that wanted to buy the guns. (Tr. at 52) Koop was to hold onto them until Hawkins

---

[2]The statement of "Look guy, if you want to see them for Christmas, start flapping your gums," was either made by Taff or another officer. It is difficult to identify the voice from the tape. Either way, an officer made the threatening statement to Koop.

4

found somebody. (Tr. at 52)

9. On September 9, 2010, defendant Koop was in his motel room with his wife and children when he heard noise outside. (Tr. at 52) Koop looked out the window and saw a whole bunch of police officers coming. (Tr. at 52) After the police knocked on the door, Koop asked his wife to open the door and he got behind her. (Tr. at 53) Koop said he got behind his wife because he was freaked out. (Tr. at 53) Koop testified that he was then escorted outside and put in handcuffs. (Tr. at 53) Koop believed that the officers read him his Miranda rights. (Tr. at 65-66) Task Force Officer Decker testified that he did not read Koop his Miranda rights because he was not arrested on any charges and Decker stated that patrol officers do not read Miranda rights to anyone. (Tr. at 103)

10. Defendant Koop testified that the police officers wanted to know "where the guns were and everything else." (Tr. at 54) Koop testified that he "cooperated and everything." (Tr. at 54) When asked why he decided to cooperate, Koop testified:

> Because basically, I mean, I cooperated for the simple fact, I mean, it wasn't mine, but I know what I did, you know, and everything else. And it was eventually going to come down to the time to where it was all basically going to come down to an end. I was to that point. ... To the point where the cops were going to be showing up anyway because I had the guns in my room.

(Tr. at 55) Koop told the officers that he was holding guns for Hawkins. (Tr. at 65) When Koop was asked by the officers if he (Koop) was a convicted felon, Koop answered that he believed he was. (Tr. at 88) Koop and his wife each consented to a search of the motel room after the officers had searched the room for Hawkins (and found the long guns). (Tr. at 85) Koop told the officers that there were handguns rolled up in a towel under the sink. (Tr. at 85-86)

11. ATF Task Force Officer Jason Decker testified that he received a call from Officer Taff stating that they had defendant Koop in custody at a motel and that they were currently looking for defendant Hawkins, who had an outstanding parole violation. (Tr. at 92) Officer Taff further advised Task Force Officer Decker that while looking for Hawkins in Koop's motel room, the officers had discovered some firearms and then learned that the firearms belonged to Hawkins. (Tr. at 92) Task Force Officer Decker and his partner, Special Agent Kelly Etnier, went to the motel. (Tr. at 92) Koop told the officers that Hawkins wanted the firearms to sell and that Koop was to meet up with Hawkins to give him the firearms. (Tr. at 93) Task Force Officer Decker spoke with Koop about making recorded phone calls. (Tr. at 93) Task Force Officer Decker stated that Koop was cooperative. (Tr. at 93) Task Force Officer Decker testified that he did not threaten Koop nor did he make Koop any promises or inducements to make the phone calls. (Tr. at 96) Task Force Officer Decker was not aware of any other officers making threats or promises to Koop. (Tr. at 104)

12. Defendant Koop testified that at some point, he got a phone call from defendant Hawkins to meet him on the guns so he "proceeded to cooperate with the police and basically led them to Hawkins." (Tr. at 54-55) Hawkins first tried calling the motel phone and then called Koop's cell phone. (Tr. at 56) Hawkins told Koop that he found somebody for the guns. (Tr. at 56) Koop was released from the handcuffs and allowed to go into his motel room when the motel phone was ringing. (Tr. at 56) Koop testified that he agreed to the recording of his phone calls. (Tr. at 55)

5

13. Defendant Koop's cell phone was hooked up to a recording device. (Tr. at 56, 94) Koop made a number of calls to Hawkins and Hawkins made calls to Koop as well. (Tr. at 56) These calls were recorded. (Tr. at 56, 94) One of the calls was made on the road and the rest were made while Koop was still at the motel. (Tr. at 56)

14. Defendant Koop left the motel with Task Force Officer Decker and Special Agent Etnier. (Tr. at 57, 97) Koop was in the front passenger seat of Task Force Officer Decker's vehicle. (Tr. at 57, 97) Task Force Officer Decker was driving and Special Agent Etnier was seated behind Koop. (Tr. at 57, 97) Koop was not handcuffed and no one was pointing a gun at him. (Tr. at 57, 97-98) The officers were taking Koop to meet defendant Hawkins. (Tr. at 57) While Hawkins was giving Koop directions as to where he was located, the officers were relaying the information to other officers so that they could move into the area. (Tr. at 98) Task Force Officer Decker testified that Koop did not appear confused at any time while making the phone calls and his conversations with Hawkins were coherent. (Tr. at 98)

15. Defendant Koop was released on September 9, 2010. (Tr. at 58) Koop testified that no one threatened him to cooperate with the police, that no one promised him anything for cooperating with the police and that no one coerced him to get him to cooperate with the police. (Tr. at 58) According to Koop, he made the phone calls voluntarily and without any kind of inducement. (Tr. at 75) When questioned on cross-examination, Koop testified that no officer threatened to put him in prison for five years and that no officer told him that they would let him go free if he cooperated. (Tr. at 66) Upon the playing of the dash cam audio where officers made such statements numerous times to Koop (see Defendant's Ex. 1-A) while he was still handcuffed (see Government's Ex. 1), Koop testified that he still did not remember these things being said. (Tr. at 68-69) According to Koop, everything was happening so fast that he could not remember any of it. (Tr. at 69) Yet, upon further questioning by government counsel, Koop testified that he could recall the police knocking on his door, making the telephone calls and that he voluntarily made the calls. (Tr. at 78) Koop testified that he was not under the influence of drugs at the time of his arrest. (Tr. at 69)

## III. DISCUSSION

Defendant Hawkins seeks to suppress "all evidence obtained from the tape recorded phone calls allegedly placed by the codefendant Nathan Koop ... to Defendant Frank Hawkins." ( Motion [to] Suppress Evidence of Tape Recorded Conversations (doc #42) at 1) Defendant Hawkins argues that "the factual circumstances surrounding [Koop's] arrest created an environment that was extremely coercive, thus invalidating any consent allegedly given to the agents [who] recorded these phone calls." (Id.)

The government originally questioned defendant Hawkins' standing to challenge defendant Koop's consent through a motion to suppress evidence. (Reply to Motion to Suppress Evidence of Tape Recorded Conversations (doc #45) at 5-6) The Court directed the parties' attention to 18

6

U.S.C. § 2518 and requested further briefing. In its supplemental brief, the government concedes that Hawkins has standing to "raise a statutory violation argument under 18 U.S.C. 2518(10)(a)." (Government's Supplemental Brief on Defendant's Motion to Suppress (doc #63) at 5) The government then argues:

> 15. In United States v. Corona-Chavez, the Eighth Circuit applied an analysis of the admissibility of consensually recorded telephone calls under 18 U.S.C. § 2511 of the Act. 328 F.3d 974, 977 (8th Cir. 2003). In Corona, Maria Munoz was stopped by law enforcement in a vehicle that contained nineteen bags of methamphetamine. Id. Munoz informed law enforcement that she was scheduled to deliver the methamphetamine to a man named Carlos and agreed to make multiple recorded phone calls to Carlos Gaytan from her cell phone to arrange the delivery. Id. On one of the calls Gaytan had Munoz speak with Emilio Corona to give Munoz directions to a hotel to deliver the drugs. Id. At the delivery location Corona was placed under arrest. Id. Corona sought to suppress the recorded phone call where he gave Munoz directions asserting that Munoz's consent was involuntary. Id. At the suppression hearing the Magistrate Judge found that prior consent to the phone recording by Munoz rendered the interception of the phone call valid. Id. at 978.
>
> 16. While Corona does not address the issue of standing[footnote] it does conduct a constitutional and statutory analysis regarding the admissibility of the consensually recorded phone calls. Corona holds that the Act "provides that it is not unlawful to intercept such a communication if a party to the communication has given prior consent to the interception." Id. (citing 18 U.S.C. § 2511(2)(c).) Nor does such an interception violate the Fourth Amendment. Id. Consent may be expressed or implied. Id. When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception. Id.
>
> 17. In the present case, similar to Corona, the communication was not unlawfully intercepted and no relieve [sic] should be granted under 18 U.S.C. 2518(10). Koop knowingly and voluntarily consented to making the recorded phone calls. At the suppression hearing law enforcement officers testified about Koop [sic] cooperative demeanor. ATF Task Force Officer Decker also testified that the recording device included an earpiece and a recorder, which Koop willing [sic] used when placing the recorded phone calls to defendant Hawkins. Additionally, Koop testified that he freely and voluntarily made the recorded phone calls to defendant Hawkins.
>
> 18. Koop knowingly and voluntarily consented to making the recorded phone calls to defendant Hawkins. The recorded phone calls do not violate the Fourth Amendment or statutory law. See Corona, 328 F.3d at 977.
>
> _____
>
> [footnote]In Corona, the defendant challenged the voluntariness of Munoz's consent. It is unclear if the defendant raised this challenge under a Constitutional violation of the Fourth amendment or a statutory violation of 18 U.S.C. 2518. Nevertheless, it appears that the Government did not advance a standing argument at the suppression

hearing, thus effectively waving [sic] such an argument on appellate review.
(Government's Supplemental Brief on Defendant's Motion to Suppress (doc #63) at 5-6)

18 U.S.C. § 2518, the statute setting forth the procedure for the interception of wire, oral or electronic communications, states in part:

> (10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter,[3] or evidence derived therefrom, on the grounds that–
>
> (i) the communication was unlawfully intercepted ....

18 U.S.C. § 2518(10)(a)(i). Any aggrieved person is defined as: "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

The Court finds that defendant Hawkins has standing to challenge defendant Koop's consent through a motion to suppress evidence as Hawkins is an "aggrieved person" (as both a party to an intercepted communication and a person against whom the interception was directed). Although the government urges the Court's reliance on Corona-Chavez, this case does not provide the Court with much guidance as it does not deal with the issue of the voluntariness of a consent. While the government contends that "[i]n Corona, the defendant challenged the voluntariness of Munoz's consent,"[4] the case specifically states otherwise. "Corona challenges the district court's finding of consent in fact, rather than raising the related question of whether such consent was voluntary." United States v. Corona-Chavez, 328 F.3d 974, 978 (8th Cir. 2003).

While the Corona-Chavez case does not address the issues of standing or the voluntariness of a consent, numerous other cases have found that defendants, such as defendant Hawkins, do have

---

[3] 18 U.S.C. § 2511(2)(c) provides: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where ... one of the parties to the communication has given prior consent to such interception."

[4] (Government's Supplemental Brief on Defendant's Motion to Suppress (doc #63) at 6 n.1)

8

standing to challenge the voluntariness of another's consent to the recording of a phone conversation with them. In United States v. Hodge, 539 F.2d 898, 900 (6th Cir. 1976), cert. denied, 429 U.S. 1091 (1977), a government informant (Mondaine) consented to the recording of telephone conversations between himself and defendant Hodge. Defendant Hodge argued that admission of the conversations into evidence violated the Fourth and Fifth Amendments of the United States Constitution and 18 U.S.C. § 2511. Id. The court found:

> ... A person may challenge government evidence on the ground that it was seized by electronic surveillance violative of his Fourth Amendment right to be free of unreasonable searches and seizures if the person was a party to the conversation ....
>
> * * *
>
> Hodge submits that no valid consent to the interception occurred as Mondaine was "coerced" into consenting in hopes of leniency. In United States v. Silva, 449 F.2d 145, 146 (1st Cir. 1971), cert. denied, 405 U.S. 918 ... the Court declared:
>
>> ... to establish involuntariness the defendant's burden[5] is to show that (the informant's) will was overcome by threats or improper inducement amounting to coercion or duress ....
>
> Mondaine testified that contact with the DEA was upon his voluntary initiation and that, although he hoped for leniency, no promise of leniency was offered by government officials. Hodge has presented no evidence of coercive threats or improper inducement of Mondaine and has thus failed to carry his burden of proof on this issue.

Hodge, 539 F.2d at 904-05. In United States v. Rodriguez, 169 F.Supp.2d 319, 320-22 (D. Vt. 2001), a government informant (Spagnola) consented to the recording of telephone conversations between himself and defendant Rodriguez. Rodriguez argued that Spagnola's consent was not meaningful because was Spagnola was in the process of acute withdrawal from heroin at the time he allegedly consented. Id. at 326. The court found:

> ... Clearly, Rodriguez has standing to contest the validity of the monitoring of the phone calls that he was a party to. ...

---

[5] In United States v. Moore, 96 F.Supp.2d 1154, 1157 (D. Colo. 2000), the court stated "the burden is on the government to establish that ... consent was knowing and voluntary. United States v. McKneely, 69 F.3d 1067, 1073 (10th Cir. 1995)('If the defendant raises the question whether the consent was knowing and voluntary, the burden of proof then falls on the government to establish the consent')."

9

* * *

> ... Spagnola testified that he had discussed the matter of his cooperation with his attorney and that his free will was not impaired in any way by his prior heroin use. Rather, he said that his cooperation was a "conscious decision." ... Thus, the Court finds that Spagnola's consent was meaningful.

Id. In United States v. Cresta, 592 F. Supp. 889, 893 (D. Me. 1984), a government informant (Kenney) consented to the recording of telephone conversations between himself and defendants. In exchange for Kenney's cooperation, DEA agents promised to inform the sentencing judge in Kenney's pending smuggling prosecution of Kenney's assistance and to recommend to that judge that Kenney serve his prison sentence at a designated institution. Id. at 893-94. Defendants argued that Kenney's consent was not voluntary. Id. at 898. The court found:

> ... The only defendant with standing to seek suppression of any of Kenney's intercepted telephone conversations is Porter, who the government concedes was a party to the sixth call made by Kenney ....
>
> ... Finally, although the issue of voluntariness was exhaustively explored at the suppression hearing, nothing in the record remotely suggests that Kenney's consent was coerced or otherwise involuntary, or that he was under the influence of drugs or alcohol.

Id. at 899. See also United States v. Restrepo, 890 F. Supp. 180, 202 (E.D.N.Y. 1995)("Courts routinely examine the voluntariness of any consent given by government informers to interception of telecommunications in suppression motions filed by the defendants against whom the evidence obtained in the intercepted conversations is to be used. ... Denial of suppression motions in these cases rested not on the defendants' lack of standing but on findings by the court of voluntary consent by another party.")

Based on the foregoing statutes and case law, defendant Hawkins clearly has standing to contest the voluntariness of defendant Koop's consent to the recording of the phone calls. While the testimony before the Court would suggest that Koop's consent was voluntary, the Court finds that other evidence before the Court, in particular the audio evidence, requires a finding that Koop's

Case 4:12-cr-00062-BCW   Document 70   Filed 10/18/12   Page 10 of 12

consent was not voluntarily given. The audio evidence shows that Officer Taff[6] repeatedly threatened Koop with jail time if he did not cooperate and make the phone calls to Hawkins and promised Koop release if he did cooperate and make the phone calls. (See Fact No. 5, supra) The government concedes that "Koop was immediately placed under arrest for his outstanding warrants when KCPD officers encountered him at the Capital Inn." (Reply to Motion to Suppress Evidence of Tape Recorded Conversations (doc #45) at 8) Koop's statements about having an attorney with regard to these warrants were ignored by Officer Taff. (See Fact No. 5, supra) Koop was in handcuffs while the threats and promises were being made. (Id.) While Officers Ward and Little apparently did not hear Officer Taff threaten Koop or make him promises (id.), these threats and promises were indeed made as evidenced by the audio recording. Defendant Koop's testimony that no threats or promises were made to him (see Fact No. 15, supra) is in direct conflict with the audio recording. Contrary to Koop's testimony, the Court further finds that he was not given any Miranda warnings as no Miranda warnings were caught on the audio, no officer testified to giving Koop Miranda warnings and Task Force Officer Decker testified that patrol officers do not read Miranda rights to anyone. (See Fact No. 9, supra) The Court finds that defendant Koop's memory might be influenced by the fact that he is cooperating with the government "in hopes of getting a better sentence." (See Fact No. 6, supra) The audio recording further evidences that the threats and promises to Koop did, in fact, influence him in that he did not even acknowledge knowing Hawkins prior to the threats and promises. (See Fact No. 5, supra)

Based on the evidence outlined above, the Court finds that defendant Koop's will was overcome by threats or improper inducement amounting to coercion or duress by Officer Taff. It was only after the coercion that Koop agreed to make the recorded phone calls to defendant

---

[6]In Defendant's Motion for Rehearing (doc #67), defendant Hawkins requests a supplemental hearing for the purpose of eliciting testimony from Troy Taff, who is no longer employed as a police officer with the Kansas City, Missouri Police Department, and in light of newly discovered evidence that Taff had previously been involved in litigation involving excessive force allegations. The Court finds a supplemental hearing to be unnecessary as the audio tape before the Court is sufficient evidence of the threats and promises made to Koop by Taff.

Hawkins. The Court finds it significant that when the phone calls were actually made, the officers knew that Koop was not a felon and believed "we got nothing on this guy," yet they did not share this information with Koop. (See Fact No. 5, supra) Because defendant Koop's consent was not freely and voluntarily given, the recording of the telephone calls cannot fall within the exception of 18 U.S.C. § 2511(2)(c). The government should be prohibited from using the intercepted communications and any evidence derived therefrom pursuant to 18 U.S.C. § 2515.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting defendant Hawkins' Motion [to] Suppress Evidence of Tape Recorded Conversations (doc #42). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion for Rehearing (doc #67).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                    */s/ Sarah W. Hays*
                                                    SARAH W. HAYS
                                    UNITED STATES MAGISTRATE JUDGE